AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Brenda Lili Barrera Orantes | ) Case No. 3:25-mj-00104 |
| | ) |
| | ) **SEALED** |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

*[Stamp in upper right:]* Certified to be a true and correct c p f g n l l d i m t i D i r  Dated: 04/15/2025  MEL  A AUB N C e k of Co t  U.S. District Court of Oregon  By: s/D. Norris  Pages 1 Through 26

## CRIMINAL COMPLAINT
## BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  02/2/22; 02/3/22;10/9/25;10/22/25  in the county of  Washington  in the

District of  Oregon , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1956(a)(3)(B) (six counts) | Money Laundering - Conducting or attempting to conduct a financial transaction with funds represented to be proceeds of a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds. |

This criminal complaint is based on these facts:

See attached affidavit of HSI TFO Christopher Iverson

☑ Continued on the attached sheet.

/s/ By Phone
_____
*Complainant's signature*

Christopher Iverson, Task Force Officer, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at  9:03am  a.m./p.m.

Date:  04/15/2025

/s/ Stacie F. Beckerman
_____
*Judge's signature*

City and state:  Portland, Oregon

STACIE F. BECKERMAN, U.S. Magistrate Judge
_____
*Printed name and title*

SEALED 3:25-mj-00104

DISTRICT OF OREGON, ss:        AFFIDAVIT OF CHRISTOPHER IVERSON

### Affidavit in Support of a Criminal Complaint and Arrest Warrant

I, Christopher Iverson, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed as a Task Force Officer (TFO) with Homeland Security Investigations (HSI) since January 2023. I am currently assigned to the HSI Portland Narcotics and Bulk Cash Smuggling group in Portland, Oregon. I have over 12 years of experience as a law enforcement officer. Concurrent to my assignment with HSI, I am a Narcotics Investigator with the Washington County Sheriff's Office (WCSO) Westside Interagency Narcotics (WIN) team. My formal education includes a Bachelor of Arts in Architecture from the University of Oregon. My formal law enforcement training includes receiving over 2,000 hours of training as documented by the Department of Public Safety Standards and Training (DPSST). I currently hold an Advanced Police certificate. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement. Additionally, I have also been involved in investigations involving wiretaps as part of federal investigations into narcotics trafficking and money laundering.

**Affidavit of Christopher Iverson**                                      **Page 1**

3.     I submit this affidavit in support of a criminal complaint and arrest warrant for

**Brenda Lili Barrera Orantes** for Money Laundering in violation of 18 U.S.C. § 1956(a)(3)(B).

As set forth below, there is probable cause to believe, and I do believe, that **Brenda Lili Barrera**

**Orantes** committed Money Laundering in violation of 18 U.S.C. § 1956(a)(3)(B) by conducting

the following ten transfers:

| Date | Transfer Amt | Sender Initials | Wire Location |
|------|------|------|------|
|  |  |  |  |
| 02/02/2022 | $2,500.00 | J.M. | Beaverton |
| 02/02/2022 | $2,500 | J.M. | Beaverton |
| 02/02/2022 | $2,000 | J.M. | Beaverton |
| 02/03/2022 | $1,928 | J.M. | Beaverton |
| 10/9/2024 | $2,465.48 | J. M. H. | Beaverton |
| 10/9/2024 | $2,465.48 | J. A. O.P. | Beaverton |
| 10/9/2024 | $2,465.48 | F. B. S. | Woodburn |
| 10/9/2024 | $2,465.48 | W. R. G. | Woodburn |
| 10/9/2024 | $2,465.48 | G. M. O. | Odell |
| 10/22/2024 | $2,396.45 | G. M. C.C. | Beaverton |

## **Applicable Law**

4.     Title 18, Section 1956(a)(3)(B) prohibits conducting a financial transaction

involving property represented to be the proceeds of a specified unlawful activity with the intent

to conceal and disguise the nature, location, source, ownership, or control of the proceeds.

5.     "Financial transaction" means (A) a transaction which in any way or degree

affects interstate or foreign commerce (i) involving the movement of funds by wire or other

means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title

to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a

financial institution which is engaged in, or the activities of which affect, interstate or foreign

commerce in any way or degree. 18 U.S.C. § 1956(c)(4).

**Affidavit of Christopher Iverson**                                                                    **Page 2**

6.      "Specified unlawful activity" means a variety of enumerated offenses including drug trafficking. 18 U.S.C. § 1961(1)(D).

## Statement of Probable Cause

7.      The Department of Homeland Security, Homeland Security Investigations (HSI), Westside Interagency Narcotics Team (WIN) and the Internal Revenue Service Criminal Investigation (IRS CI) are investigating a Portland metropolitan area-based Money Service Business (MSB) chain called La Popular operated by BRENDA LILI BARRERA ORANTES (hereinafter, "**BARRERA**").

8.      On June 4, 2020, articles of organization for **La Popular #1** were filed with the Oregon Secretary of State under the business name #1 La Popular LLC. BARRERA is listed as the member and registered agent. The principal place of business is listed as 1011 SE Walnut St, Suite B, Hillsboro, Oregon 97123.

9.      On November 22, 2021, article of organization for **La Popular #2** were filed with the Oregon Secretary of State under the name #1 La Popular 2 LLC with an address of 13755 SW Farmington Road, Beaverton, Oregon 97005.  During the course of this investigation, BARRERA moved the business to its current location at 4735 SW Murray Blvd, Beaverton, OR 97005**.** On March 7, 2023, an application for registration was filed with the Oregon Secretary of State under the name #1 La Popular 2. The principal place of business is listed as 4735 SW Murray Blvd, Beaverton, OR 97005.

10.     In October 2022, BARRERA opened another store at 4712 E Fourth Plain Blvd., Suite B, Vancouver, Washington 98661 (hereinafter, **"La Popular WA"**). Washington Secretary of State records show **La Popular WA** went inactive due to failing to file an annual report and was administratively dissolved on March 3, 2025. However, based on surveillance, I know **La**

**Affidavit of Christopher Iverson**                                                      **Page 3**

**Popular WA** has been open for business as recently as April 10, 2025. On April 10, 2025, at approximately 11:40 a.m., Special Agent Scott McGeachy conducted surveillance at 4712 E. Fourth Plain Blvd., Ste. B, Vancouver, WA 98661. Special Agent McGeachy observed a sandwich board outside the business depicting "Envios de Dinero". Neon signs inside the business were lit up with the words "Open." The front door to the business was propped open and Special Agent McGeachy observed customers entering and exiting the business through the front door consistent with and indicative of the business being open and active.

11.     Other **La Popular Businesses** controlled by **BARRERA** also operate in Canby, Odell and Woodburn. Investigators learned of **BARRERA** opening a money service business (MSB) storefront in Salem, Oregon. On June 6, 2024, articles of organization were filed with the Oregon Secretary of State under the name El Ranchero Chido Vaqueros 100% LLC. **BARRERA** is listed as the registered agent and member for the business. The principal address is listed as 1981 Lancaster Drive NE, Salem, Oregon 97305. The mailing address for the business, and **BARRERA**, is listed as 8396 SW 158th Place, Beaverton, Oregon. This address was believed to be the primary residence for **BARRERA** in at least 2022 and 2023. The current association with **BARRERA** to the residence is unknown by Investigators. Due to the recentness of the opening of the store, no financial data has been collected or analyzed. The storefronts operating in the other Oregon cities are also owned, operated, and/or registered by **BARRERA** with the Oregon Secretary of State.

12.     The **La Popular Businesses** advertise their ability to transmit money nationally and internationally for a fee. Based on my training and experience, money service storefront locations like the **La Popular Businesses** are agents of large corporate MSBs such as Intermex, Ria, Intercambio Express, and Sigue. Such agents typically have a cash-to-wire model, where

**Affidavit of Christopher Iverson**                                                    **Page 4**

they accept cash from customers and use various corporate MSB wire remittance platforms to transfer the funds on behalf of customers to locations within the United States and internationally including to Mexico, Honduras, and other countries.

13.     Within the last five years, Investigators working in the Portland metro area have observed a transformation in the local drug trade.  Mexican drug trafficking organizations (DTOs) are now working closely with Honduran nationals to conduct much of the street level distribution of narcotics including fentanyl.  Honduran nationals come into the United States and will often report to Oakland, California, prior to being dispatched by the DTOs to the Portland metro area or elsewhere for their drug trafficking assignments.[1]  Instead of the sole focus on bulk cash smuggling to physically transport criminal proceeds to the Mexico-based DTOs, Honduran drug sellers are often instructed by their bosses to take proceeds of their drug sales to a local MSB such as the **La Popular Businesses** to transmit to a source of supply to pay for the drugs. Honduran traffickers also use MSBs, including the **La Popular Businesses**, to transmit money earned from selling drugs to their families in Honduras.  Due to geographic limitations, Honduran drug traffickers lack the ability to bulk cash smuggle drug proceeds from Portland, Oregon through Mexico down to Honduras.  Instead, they use MSBs to help conceal their illegal activities.  To launder their ill-gotten gains, drug traffickers and/or MSB agents often manipulate the wire remittance requirements by falsifying information.  Investigators' analysis of records pertaining to the **La Popular Businesses** reveal the use of false sender names and addresses and indicia of structuring transactions by breaking down the cash provided by the drug trafficker to

---

[1] *See, e.g., This is the Hometown of San Francisco's Drug Dealers*, available at https://www.sfchronicle.com/projects/2023/san-francisco-drug-trade-honduras/ (last accessed April 9, 2025).

**Affidavit of Christopher Iverson**                                                          **Page 5**

multiple wire remittances in lower amounts, across multiple La Popular storefronts, presumably to avoid the mandatory record-keeping requirements.

### B.    The Nature of Wire Remittances at an MSB

14.    Many international wire remittances do not involve funds generated through criminal activity.  From my experience and training, I am aware that international wire transactions are often non-criminal "family remittances," which is when foreign laborers in the United States use MSBs to transfer funds earned in the United States to their families in their home countries.  However, it has been the experience of investigators working on international money laundering that wire remittances $500 and over have a much higher correlation with organized illegal activity, including drug trafficking and money laundering.

15.    A typical wire transaction begins when a customer (sender) visits a local storefront MSB agent with cash for the purpose of sending the money to a receiver (beneficiary). The MSB agent is either connected to their corporate MSB via a computer terminal or by a direct telephonic connection inside the store.  The customer provides their own name, address, and telephone number.  The customer also provides the name of the receiver (beneficiary) of the wire remittance, as well as the receiver's city, state, and country.  The customer provides this information either directly to an employee at the MSB agent location for the employee to enter it into the corporate MSB computer system or the customer uses a telephone at the sending agent location to speak directly with an operator who works for the corporate MSB; either way the same result is achieved.

16.    After the information is collected, the sender provides cash to the local MSB agent in the amount to be transferred plus a fee charged by the corporate MSB to facilitate the transaction.  The fee for a wire remittance is approximately $10.00 to $30.00 depending on the

**Affidavit of Christopher Iverson**

amount of the transfer (for example the MSB company known as Intermex charges approximately $30.00 on a $2,000 transfer, and $20.00 on a $1,000 transfer). The local MSB agent then prepares and provides to the customer a receipt containing all the transaction information including the amount of the transaction, the date and time the remittance was sent, and a unique transaction number sometimes called an MTCN (Money Transfer Control Number). The customer gives this MTCN number to the intended beneficiary, which is required for the beneficiary to pick up the funds at the wire remittance destination location. Once the beneficiary receives the MTCN from the sender, they visit their own MSB agent, present their identification and the MTCN, and obtain the transmitted cash.

17.    Another way a local MSB transmits a wire remittance is directly to a recipient's bank account. The sender provides the local MSB with a bank account number and routing number for the recipient. Wire remittances transmitted to a bank account in Mexico are often shown as being processed through Distrito Federal, Mexico, but the recipient may reside anywhere in Mexico, and they can access the transmitted funds anywhere by using a debit card for the account.

18.    Local MSB agents must provide the corporate MSB with the cash they have collected from conducting wire remittances for customers. MSB agents typically accomplish this by making large cash deposits into a local corporate bank account maintained by the parent MSB. The required frequency of the cash deposits to the corporate MSB vary among different companies, but typically occurs every few days.

**Affidavit of Christopher Iverson**                                                      **Page 7**

### C.    Summary of La Popular Business Wire Transmissions

19.    Aggregate data from law enforcement financial databases, subpoenaed documents, and surveillance show that **BARRERA** has served as an agent for several MSB services and is currently an agent for Intermex, Maxi, and Ria.

20.    The **La Popular Businesses** appear to have been in business since 2020. Analysis of the wire transfer data identified multiple red flags present in the **La Popular Businesses**, indicating that the **La Popular Businesses** have been operating as complicit MSB agents, aiding in the laundering of drug proceeds. Those red flags include, but are not limited to:

- The heavy concentration of transfers being sent to known drug source locations;

- Multiple transfers being sent in rapid succession (sometimes only a few minutes apart). These are referred to as "bursts" or "clusters";

- Many of the transactions involving suspected drug proceeds are below $1,000, which is a common corporate MSB threshold that requires the agent to collect some form of ID from the sender;

- Lack of commonalities or apparent familial ties between the sender and receiver; and

- Recipients of the wires are also receiving wires from several other people throughout the U.S., including transfers made through other known complicit agent locations.

21.    Data received pursuant to subpoenas served on Intercambio, Ria (CES), Maxi, and Viamericas show that for the period of January 2021, through April of 2024, the **La Popular Businesses** in Oregon have processed over $89 million in wire remittances (see Chart 1 below).

**Affidavit of Christopher Iverson**                                                                                    **Page 8**

**Chart 1**

| All Completed Transactions Conducted Through La Popular | | | | | |
|---|---|---|---|---|---|
| January 2021 - April 2024 | Ria | Intercambio | Maxi | Viamericas | Total |
| Total Wires Sent | 39,730 | 1,061 | 133,701 | 4,337 | **178,829** |
| Total USD Sent | 20,947,892.15 | 752,358.82 | 64,827,413.06 | 2,580,144.52 | $ **89,107,809** |

22.　　It should be noted that La Popular lost its license with Viamericas in January 2022 following an internal review by their compliance department. In an email to the compliance supervisor dated January 28, 2022, a Viamericas sales rep described a site visit to La Popular in which he witnessed a customer come in with a wad of cash, gave it to the cashier of the store, and told her that he would send her the IDs of the customers' names. The rep stated that the cashier did not ask the customer any questions and told the rep that she was following instructions received from BARRERA.

23.　　A further breakdown of the above data shows the volume and value of remittances associated with each of the Oregon **La Popular Businesses** (see Chart 2 below). **La Popular #1** is responsible for the highest dollar amount with a total amount sent of $53,089,337.43 during the time period. **La Popular #2** recorded the second highest at $27,429,397.32.

///

///

**Affidavit of Christopher Iverson**　　　　　　　　　　　　　　　　　　**Page 9**

**Chart 2**

| All Transactions Conducted Through La Popular stores January 2017 - April 2024 Includes transactions by Ria, Intercambio, Maxi, and Viamericas | | |
|---|---|---|
| Total Wires Sent | **178,829** | |
| Total Amount Sent | **$ 89,107,809.00** | |
| | | |
| La Popular 1 (Walnut-Hillsboro) | 53,089,337.43 | |
| La Popular 2 (Murray-Beaverton) | 27,429,397.32 | |
| La Popular 3 (Newberg Hwy-Woodburn) | 7,946,346.09 | |
| La Popular 4 (1st Ave-Canby) | 538,844.71 | |
| La Popular 5 (Odell Hwy-Odell) | 103,883.00 | |
| **Total Wire Amount Sent** | **$ 89,107,808.55** | |
| | | |

24.     The transactions included in the volume and value calculated in Chart 2 above were filtered further by eliminating all wire transfers below $500. This filter is substantiated by an article posted by AP News stating that in 2023, total wire remittances reached a record $63.3 billion sent to Mexico, but the average amount of each wire transfer had remained consistent at around $393 (2022 the average remittance was $391).  Therefore, the designated dollar threshold amount of $500 and greater was specifically designed to limit the dataset to only those money transfers with a much higher likelihood of involvement in the illegal activity.

25.     Chart 3 below identifies the volume and value of wire transfers $500 and above for the Oregon **La Popular Businesses**.  Of the $89,107,808.55 in total remittance transactions, $67,939,175.88 were transactions in amounts of $500 and over.   **La Popular #1** is responsible for the highest dollar amount with a total amount sent of $40,099,836.52.  **La Popular #2** recorded the second highest at $20,760,773.77.

**Affidavit of Christopher Iverson**                                                                 **Page 10**

**Chart 3**

| Transactions Conducted By La Popular ≥ $500 January 2017 - April 2024 Includes transactions by Ria, Intercambio, Maxi, and Viamericas | | |
|---|---|---|
| | | |
| Total Wires Sent | **61,338** | |
| Total Amount Sent | $ **67,939,175.88** | |
| | | |
| La Popular 1 (Walnut-Hillsboro) | 40,099,836.52 | |
| La Popular 2 (Murray-Beaverton) | 20,760,773.77 | |
| La Popular 3 (Newberg Hwy-Woodburn) | 6,603,495.59 | |
| La Popular 4 (1st Ave-Canby) | 402,069.00 | |
| La Popular 5 (Odell Hwy-Odell) | 73,001.00 | |
| **Total Wire Amount Sent** | $ **67,939,175.88** | |
| | | |

26.     Of the transactions consisting of dollar amounts $500 and above, a further analysis of the wire remittances transmitted by the **La Popular Businesses** show a significant concentration of wire remittances to Jalisco, Michoacan, Nayarit, Sinaloa, and Distrito Federal. Based on my training and experience, I know these areas to be associated with Mexican Drug Trafficking Organizations (DTOs).  From January 2021 through April 2024, of the $67,939,175.88 of transactions $500 and above, a total of $18,489,389.78 were destined for identified drug trafficking corridors in Mexico.

27.     Moreover, Francisco Morazan, a department (like a province or a state) in Honduras, also received a large volume of wire remittances from the La Popular Businesses ($331,961.00 using the same filters).  As noted above, the Honduran drug traffickers have taken over much of the street level trafficking within the greater Portland metropolitan area and the wire remittances $500 and over destined for Francisco Morazan is emblematic of the flow of money from the Honduran drug traffickers back to their home country.

**Affidavit of Christopher Iverson**                                    **Page 11**

28.     Chart 4 below shows volume and value of wire remittances $500 and above sent

from **La Popular Businesses** destined for the known narcotic source states within Mexico, and

Francisco Morazan, Honduras.

**Chart 4**

| Transactions Conducted By La Popular ≥ $500 January 2017 - April 2024 Includes transactions by Ria, Intercambio, Maxi, and Viamericas | | |
|---|---|---|
| | | |
| Total Wires Sent to Specified States | **17,192** | |
| Total Amount Sent to Specified States | **$  18,489,389.78** | |
| | | |
| Francisco Morazon, Honduras | 331,961.00 | |
| Sinaloa, Mexico | 1,164,563.01 | |
| Jalisco, Mexico | 1,880,524.88 | |
| Michoacan, Mexico | 6,420,099.06 | |
| Nayarit, Mexico | 3,656,303.01 | |
| Distrito Federal, Mexico | 5,035,938.82 | |
| **Total wires sent to specified states** | **$  18,489,389.78** | |
| | | |

### E.  Confidential Informant

29.     HSI Confidential Informant-1 (CI-1) has provided reliable and actionable

information to law enforcement in exchange for monetary compensation and immigration

benefits since June 2015.  No promises or guarantees have been made by investigators in order to

gain CI-1's cooperation.  CI-1 has provided information that led to arrests and seizure of

contraband.  He/she has been convicted once for possession of controlled substances.  He/she has

admitted to having an extensive history of drug trafficking and has first-hand knowledge of

marijuana, methamphetamine, cocaine, fentanyl, and heroin distribution.  Additionally, CI-1 has

assisted law enforcement with money laundering investigations including picking up and

delivering bulk U.S. currency for known Transnational Criminal Organizations (TCO) and

conducting wire transfers of bulk U.S. currency on behalf of known TCOs using fictitious sender and recipient information.  Based on CI-1's established ability to conduct recorded drug and money laundering-related phone calls with a Target Subject, and based on law enforcement's physical surveillance that corroborate CI-1's ability to order narcotics and launder known narcotics proceeds from a target subject, I believe the information he/she has provided to be credible and reliable, to the extent it has been corroborated by investigators as detailed below.

30.    HSI Confidential Informant-2 (CI-2) has provided reliable and actionable information to HSI in exchange for monetary compensation and immigration benefits since March 2016.  No promises or guarantees have been made by investigators to gain CI-2's cooperation.  CI-2 has provided information that led to arrests and seizures of contraband. He/she has been convicted once for DUI and once for driving on a suspended or revoked license, both of which occurred more than 20 years ago.  He/she has knowledge of narcotics trafficking. Based on CI-2's established ability to conduct recorded drug and money laundering-related phone calls with a target subject, and based on law enforcement's physical surveillance that corroborate CI-2's ability to order narcotics and launder known narcotics proceeds from a target subject, I believe the information he/she has provided to be credible and reliable, to the extent it has been corroborated by investigators as detailed below.

**F. HSI Undercover Agents and CI-2 Meet with BARRERA**

31.    In July 2021, HSI SA Nathan Bresee and I received information from CI-2 that **BARRERA** operated a money service business named "La Popular Envios", operating out of a storefront later confirmed by CI-2 and investigators as **La Popular #1**.  According to CI-2, **BARRERA** used her business to launder money through wire remittances to Mexico.  CI-2

**Affidavit of Christopher Iverson**                                    **Page 13**

reported he/she had previously been present at La Popular #1 when **BARRERA** had discussed her illegal operation and offered her services to CI-2.

32.     In December 2021, at the direction of investigators, CI-2 engaged in conversations with **BARRERA** about using her services.  CI-2 reported he/she and their associates had $10,000 from illicit drug sales that they wished **BARRERA** to remit using her money service business.  As a result of these conversations, **BARRERA** agreed to take possession of the $10,000.

33.     In the morning of February 1, 2022, CI-2 and **BARRERA** agreed to meet that morning for **BARRERA** to receive the $10,000 at the Home Depot located at 4401 SW 110th Ave in Beaverton, Oregon.  Two HSI Special Agents operating as undercover agents (hereinafter UCA-1 and UCA-2) agreed to assist with the money hand off.

34.     UCA-1 and UCA-2 took possession of the $10,000 in U.S. currency and drove with CI-2 to the Home Depot to conduct the money delivery to **BARRERA**.  Shortly after arriving at the Home Depot, CI-2 called **BARRERA** and told her that CI-2 and UCA-1 were there and would meet her at the store entrance.  CI-2 and UCA-1, while in possession of the $10,000, then met **BARRERA** at the Home Depot entrance.

35.     The following is a summary of UCA-1's undercover communications with **BARRERA**.  This summary is not verbatim and does not memorialize all statements made during their communications.  The communication between UCA-1 and **BARRERA** was conducted in Spanish.

36.     UCA-1 and **BARRERA** exchanged greetings and then walked to the rear bumper of the UC vehicle and engaged in conversation.  **BARRERA** told UCA-1 that she could receive UCA-1's bulk cash and send it to a recipient of UCA-1's choosing, however UCA-1 would have

to provide more than one recipient name to avoid suspicion.  **BARRERA** said she could take bulk cash and introduce it into the banking system for UCA-1 by wiring the funds to an account of UCA-1's choosing.  UCA-1 acknowledged and agreed to conduct the transaction in that fashion.

37.    CI-2 told **BARRERA** that UCA-1 wanted to conduct transactions on a regular basis.  UCA-1 expressed concern over delivering cash in a public parking lot.  **BARRERA** told UCA-1 and CI-2 that they could have a meal during the next transaction and that cash could be delivered then.

38.    UCA-1 told **BARRERA** that future deliveries would involve $100,000 in U.S. currency and that it would occur monthly.  **BARRERA** acknowledged and said she could wire the funds.  **BARRERA** stated that her fee for wiring funds was $75.00 for every $1,000 wired.[2]

39.    UCA-1 and **BARRERA** agreed that **BARRERA** would take possession of the $10,000 in U.S. currency at her vehicle out of public view.  UCA-1 and **BARRERA** proceeded to **BARRERA's** vehicle at which time UCA-1 gave **BARRERA** the $10,000.  **BARRERA** subsequently gave UCA-1 her phone number ending in 5185 (BARRERA-5185), so they could communicate directly in the future.  UCA-1, CI-2, and **BARRERA** then broke contact and the operation ceased.

40.    Following the undercover meeting, SA Bresee provided UCA-1 with a known photograph of **BARRERA**.  UCA-1 was able to positively identify the female they met with as **BARRERA**.  After UCA-1's meeting with **BARRERA**, UCA-1 sent **BARRERA** a text message

---

[2] I know from my training and experience that corrupt MSB operators often charge customers an extra fee for taking the risks associated with money laundering.

**Affidavit of Christopher Iverson**                                                **Page 15**

that contained the covert bank account number where the money was to be sent, and **BARRERA** acknowledged the text.

41.     HSI SA Sean Lafaurie later informed UCA-1 that four deposits in the amounts of $2,500.00, $2,500.00, $2,000.00, and $1,928.00, for a total of $8,928.00 USD were successfully made to the account provided to **BARRERA**.  Given the total deposit amount, **BARRERA's** laundering fees totaled $1,072.00 as opposed to the $750 ($75.00 per $1,000.00 laundered) that was originally quoted by **BARRERA** while meeting with UCA-1 and CI-2. I have reviewed records showing that the wire transfers described above were sent by **BARRERA's** La Popular business in Beaverton (the former address at 13743 SW Farmington Road) as follows: two wire transfers on February 2, 2022, each in the amount of $2,500, one wire transfer on February 2, 2022, in the amount of $2,000, and one on February 3, 2022, in the amount of $1,928.

42.     On February 22, 2022, UCA-1 called **BARRERA** at BARRERA-5185. **BARRERA** told UCA-1 that the reason they did not receive the amount of currency as expected was because the company charged additional fees that were to be incurred by UCA-1 and their associates.  **BARRERA** stated that things were complicated with the banks, which thereby changed the fees charged for her services.  UCA-1 acknowledged and said he/she simply needed to provide his/her associates with an explanation.  **BARRERA** stated the fee was in fact $100.00 for every $1,000.00 provided by UCA-1.  UCA-1 told **BARRERA** he/she would likely need "100" (referring to $100,000.00 in U.S. currency) moved on the next transaction.  UCA-1 expressed concern over delivering the money in an unsecure location.  **BARRERA** acknowledged and said they could sit down and have a meal during the next transaction.

### G. Confidential Informant-1 (CI-1) Meets with BARRERA

43.    On August 1, 2024, at the direction of investigators, CI-1 traveled to **La Popular #1** and requested to send money with the teller/cashier.  The teller/cashier told CI-1 he/she needed identification to transmit money.  CI-1 requested to speak with **BARRERA** regarding the money transfer.  The teller/cashier contacted **BARRERA** via phone call and placed CI-1 on speakerphone with **BARRERA**.  CI-1 stated they were referred to **BARRERA** by CI-2.  CI-1 then contacted CI-2 on speakerphone as well.  CI-2 and **BARRERA** then engaged in conversation from the two different phones.  CI-2 confirmed the fee to transfer money would be 10%.  **BARRERA** agreed to meet CI-1 at **La Popular #1** and told CI-1 to stay at that location. Investigators established surveillance around **La Popular #1** and watched as CI-1 and **BARRERA** later met at the location.

44.    CI-1 advised **BARRERA** that he/she needed $4,000.00 in U.S. currency wired down to California immediately and provided **BARRERA** with $4,800.00 in U.S. currency, which **BARRERA** took possession of.  **BARRERA** then directed CI-1 to follow her to **La Popular #2** in Beaverton, Oregon.  Investigators were surveilling the meeting between CI-1 and **BARRERA**.  Investigators witnessed **BARRERA** and an unidentified male ("UM") accompanying her, exit the front doors of the **La Popular #1** and enter a 2020 white Ford Transit van bearing Oregon license plate 610PML ("2020 Ford van").  **BARRERA**, in the 2020 Ford van, and CI-1, in their vehicle, departed in tandem and were followed by investigators to **La Popular #2**.

45.    Upon arrival at **La Popular #2**, CI-1 and **BARRERA** entered the store, where **BARRERA** introduced CI-1 to ▮▮▮▮.  **BARRERA** advised CI-1 that ▮▮▮▮ could assist CI-1 with future wire transfers if she (BARRERA) was not available.  **BARRERA** advised CI-1 that

**Affidavit of Christopher Iverson**                                                    **Page 17**
                                                                                        Rev. April 2018

the only information she (BARRERA) would need from CI-1 to wire the $4,000.00 US currency

was the phone number of the individual receiving the U.S. currency in California. **BARRERA**

asked CI-1 if two wire transfers of $2,000.00 U.S. currency each would be ok, to which CI-1

agreed. **BARRERA** then directed ████████ to complete the wire transfer, which she did and

provided CI-1 with the wire transfer receipts. The sender information on the wire transfer

receipts were fictitious names, addresses, and phone numbers provided by **BARRERA**, not CI-1.

The recipient information for the wire transfer receipts were also fictitious and provided by

**BARRERA**, with the exception of the phone number, which CI-1 provided. Upon completion

of the wire transfer, **BARRERA** did not return the remaining $800.00 U.S. currency, which CI-1

believed to be **BARRERA's** fee for providing the fictitious sender and recipient information.

Below is a photograph of the wire transfer receipts provided to CI-1:

///

///

///

///

**Affidavit of Christopher Iverson**                                                                 **Page 18**



46.    While in the store, CI-1 and **BARRERA** continued to converse, and CI-1 advised

**BARRERA** that he/she had $100,000.00 in bulk U.S. currency which he/she needed to wire

transfer.  **BARRERA** advised CI-1 that she (BARRERA) would like to initially wire transfer

$50,000.00 U.S. currency for CI-1.  CI-1 asked what the easiest way for **BARRERA** to transfer

the bulk U.S. currency and **BARRERA** advised CI-1 that she (BARRERA) could wire transfer

the U.S. currency directly into a bank account of CI-1's choosing.  **BARRERA** advised CI-1 that

all she (BARRERA) would need is CI-1's desired bank account and routing number.

### I. Confidential Informant-1 (CI-1) Meets with BARRERA to Launder Purported Narcotics Proceeds

47.     On September 26, 2024, Investigators met in anticipation of an investigative operation during which CI-1 would utilize **BARRERA's** La Popular MSB to launder purported narcotics proceeds to undercover agents in the U.S.  CI-1 was in communication with **BARRERA** prior to the operation beginning.  During their conversation, BARRERA instructed CI-1 to meet her at **La Popular WA** located at 4712 E 4th Plain Blvd in Vancouver, Washington.

48.     Investigators met with CI-1 and provided him/her with $15,000 U.S. currency to send via wire, an additional $2,000 to pay for **BARRERA's** money laundering services, and a list of names and addresses which would be utilized to receive and recover the funds. Investigators also provided CI-1 with an audio recording device to monitor subsequent conversations with **BARRERA** and her coconspirators.  Investigators then directed CI-1 to meet with **BARRERA** at La Popular WA for the purposes of CI-1 laundering the purported narcotics proceeds, which he/she did.

49.     Investigators established surveillance around **La Popular WA** and observed CI-1 arrive and enter the store.  When CI-1 arrived at La Popular WA, **BARRERA** was not present. CI-1 exited the store and returned to their vehicle to await **BARRERA's** arrival.  Later in the afternoon, Investigators watched as the 2020 Ford van arrived in the parking lot of La Popular WA.  Investigators watched as ▓▓▓▓▓▓ exited the driver's seat of the 2020 Ford van. ▓▓▓▓▓▓ was accompanied by an unidentified Hispanic female who was riding in the front passenger seat of the 2020 Ford van.  This female was later positively identified by CI-1 and Investigators as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Investigators watched as ▓▓▓▓▓▓▓▓▓▓ carried several boxes from the 2020 Ford van into La Popular WA.

50. Shortly after the 2020 Ford van's arrival, Investigators observed **BARRERA** arrive in the parking lot of La Popular WA in her Cadillac Escalade. CI-1 and **BARRERA** exited their respective vehicles, greeted each other in the parking lot, and walked into La Popular WA together. Investigators monitored the audio recording live while CI-1 was inside La Popular WA.

51. Investigators later debriefed CI-1 after the operation concluded, had the audio transcribed by linguists, and as a result learned the following. Upon entering La Popular WA, CI-1 was directed to a back room where **BARRERA** introduced CI-1 to ▮▮▮▮▮. While in the back room, CI-1 interacted with both **BARRERA** and ▮▮▮▮▮. CI-1 provided **BARRERA** with the $15,000 U.S. currency, and the list of names to send wire remittances to. CI-1 also provided **BARRERA** with $1,500 U.S. currency for payment for her money laundering services. CI-1 and **BARRERA** had also agreed to going out to eat for food, where CI-1 would later use the remaining $500 to pay for their visit to a fine dining establishment in Vancouver, Washington. **BARRERA** told CI-1 that ▮▮▮▮▮ could perform the money remittances at La Popular WA. While CI-1 drove **BARRERA** to get lunch, CI-1 advised **BARRERA** that he/she and his/her family were involved in the narcotics trade. CI-1 told **BARRERA** that CI-1 would not jeopardize anything by traveling with drugs in their car, and CI-1 would only be transporting the money with their vehicle.

52. Later in the evening on September 26, 2024, **BARRERA** sent photos to CI-1 of eight wire transfer receipts using the recipient names provided by CI-1. The photos **BARRERA** sent showed that remittance sender names, addresses, and phone numbers were all created by either **BARRERA** or her employees. The photos of the receipts showed two transfers with operator ▮▮▮▮▮ believed by Investigators to be ▮▮▮▮▮, one transfer by operator ▮▮▮▮▮

██" one transfer by operator ██████ and four transfers by operator "Brenda L", believed by

Investigators to be **BARRERA**.

**J. Confidential Informant-1 (CI-1) Meets with ██████ and BARRERA to Launder Purported Narcotics Proceeds**

53.     On October 9, 2024, Investigators met in anticipation of an investigative

operation during which CI-1 would utilize BARRERA's La Popular MSB to launder purported

narcotics proceeds to undercover agents in the U.S.  Investigators established surveillance around

La Popular WA located at 4712 E 4th Plain Blvd in Vancouver, Washington, where they

observed a grey 2007 Toyota Rav4 bearing Oregon license plate ending in NWP parked at the

business.  A DMV records check of the vehicle showed it was registered to ██████.

Investigators showed CI-1 the Oregon DMV photograph of ██████, and CI-1 confirmed the

photograph was the individual he/she had previously been introduced to by **BARRERA**.

**BARRERA** had previously advised that ██████ was a La Popular employee, and that

██████ could assist CI-1 in laundering his/her funds.

54.     Prior to the operation, investigators provided CI-1 with $25,000 U.S. currency to

send via wire, an additional $2,500 to pay for **BARRERA's** money laundering services, and a

list of names and addresses to receive and recover the funds.  Investigators then directed CI-1 to

meet with **BARRERA** or ██████ at La Popular WA for the purposes of CI-1 laundering the

purported narcotics proceeds, which he/she did.

55.     After providing CI-1 with the money laundering funds, investigators followed CI-

1 to La Popular WA and watched him/her enter the store.  Shortly thereafter, investigators

witnessed a newer white Ford Transit Van with no license plates arrive at La Popular WA and

park adjacent to the front door.  Investigators witnessed ██████ exit the driver's seat of the

**Affidavit of Christopher Iverson**                                    **Page 22**

vehicle, while **BARRERA** exited the front passenger seat. Both ███████ and BARRERA then entered La Popular WA.

56.      After meeting with **BARRERA** and ███████, investigators witnessed CI-1 exit La Popular WA and followed CI-1 to a debrief location. During a debrief of CI-1, investigators learned CI-1 had provided **BARRERA** with the $25,000 cash to wire, and the $2,500 to pay for **BARRERA's** money laundering services. IRS-CI Special Agent Scott McGeachy later reviewed the wire remittance records and found that from October 9, 2024, through November 1, 2024, **BARRERA** and/or her cashiers laundered $24,609.29 in ten separate transactions by creating fictitious sender names to conceal and disguise the true sender of the monies (CI-1). SA McGeachy noted five of the wire remittances were conducted on October 9, 2024, (same day as the money drop with CI-1) and **BARRERA** was listed as the operator's name on these five transactions. SA McGeachy noted two of those five wire remittances were purportedly transmitted from **La Popular #2** in Beaverton, Oregon, two wire remittances were purportedly transmitted from the La Popular storefront located at 1010 Newberg Highway, Woodburn, Oregon and one wire remittance was transmitted from the La Popular storefront located at 3409 Odell Highway, Odell, Oregon. Another remittance was sent from Beaverton on October 22, 2024. The remaining four transactions were sent from the Vancouver store on various dates.

| Date | Transfer Amt | Sender Initials | Wire Location |
|---|---|---|---|
| 10/9/2024 | $2,465.48 | J. M. H. | Beaverton |
| 10/9/2024 | $2,465.48 | J. A. O.P. | Beaverton |
| 10/9/2024 | $2,465.48 | F. B. S. | Woodburn |
| 10/9/2024 | $2,465.48 | W. R. G. | Woodburn |
| 10/9/2024 | $2,465.48 | G. M. O. | Odell |
| 10/22/2024 | $2,396.45 | G. M. C.C. | Beaverton |

**Affidavit of Christopher Iverson**                                    **Page 23**

57.    At this time in the investigation, it is unknown which MSB agents processed the transactions; or if **BARRERA** took personal possession of the $25,000; or if the money remained at La Popular WA in Vancouver at the time **BARRERA** left that afternoon.  However, I believe these transactions were structured from different branch locations and under the direction of **BARRERA** and fictitious sender names were created to conceal and launder the purported drug proceeds.

58.    On October 11, 2024, CI-1 began receiving a total of ten money transfer receipts from **BARRERA**, which showed **BARRERA** was laundering the purported narcotics proceeds to the individual names that investigators had provided to CI-1.

<u>**Conclusion**</u>

59.    Based on the foregoing, I have probable cause to believe, and I do believe, that **Brenda Lili Barrera Orantes** committed **Money Laundering** in violation of 18 U.S.C. § 1956(a)(3)(B) by conducting the following ten transfers:

| Date | Transfer Amt | Sender Initials | Wire Location |
|---|---|---|---|
|  |  |  |  |
| 02/02/2022 | $2,500.00 | J.M. | Beaverton |
| 02/02/2022 | $2,500 | J.M. | Beaverton |
| 02/02/2022 | $2,000 | J.M. | Beaverton |
| 02/03/2022 | $1,928 | J.M. | Beaverton |
| 10/9/2024 | $2,465.48 | J. M. H. | Beaverton |
| 10/9/2024 | $2,465.48 | J. A. O.P. | Beaverton |
| 10/9/2024 | $2,465.48 | F. B. S. | Woodburn |
| 10/9/2024 | $2,465.48 | W. R. G. | Woodburn |
| 10/9/2024 | $2,465.48 | G. M. O. | Odell |
| 10/22/2024 | $2,396.45 | G. M. C.C. | Beaverton |

60.    I therefore request that the Court issue a criminal complaint and arrest warrant for **BRENDA LILI BARRERA ORANTES**.

**Affidavit of Christopher Iverson**                                    **Page 24**

61.    Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Julia Jarrett and AUSA Jarrett advised me that in her opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

### Request for Sealing

62.    It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested criminal complaint and arrest warrant.  I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation. Premature disclosure of the affidavit, the criminal complaint, and the arrest warrant may adversely affect the integrity of the investigation.

*By phone pursuant to Fed. R. Crim. P. 4.1*
CHRISTOPHER IVERSON
Task Force Officer, HSI

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 9:03 a.m. on April 15, 2025.

_____
HONORABLE STACIE F. BECKERMAN
United States Magistrate Judge

**Affidavit of Christopher Iverson**                                    **Page 25**